Andrew Rozynski, Esq.
Eric M. Baum, Esq
EISENBERG & BAUM, LLP
24 Union Square East, Fourth Floor
New York, NY 10003
Main: (212) 353-8700
Fax: (212) 353-1708
Email: arozynski@eandblaw.com
        ebaum@eandblaw.com

Morgan Williams
NATIONAL FAIR HOUSING ALLIANCE
1331 Pennsylvania Avenue, NW, Suite 650
Washington, DC 20004
Main: (202) 898-1661
Email: mwilliams@nationalfairhousing.org

Jared Allebest, #13485 (UT)
ALLEBEST LAW GROUP PLLC
8978 South Quarry Stone Way
Sandy, Utah 84094

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE | COMPLAINT |
| Plaintiffs, | Civil No. 2:20-cv-00312-DBP |
| vs. | Judge Dustin B. Pead |
| BEEHIVE HOMES, INC.; BEEHIVE HOMES OF LEHI; and ROES I-IX | Jury Trial Requested |
| Defendants. | |

Plaintiff, National Fair Housing Alliance, by and through its undersigned counsel, Eisenberg & Baum, LLP, and Allebest Law Group, PLLC, for its Complaint against Defendants, hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff, National Fair Housing Alliance ("NFHA"), is a non-profit organization whose mission is to eliminate housing discrimination and ensure equal housing opportunities throughout the United States. Defendants own and/or operate numerous nursing homes and assisted living residences throughout Utah and nationwide. Defendants refused auxiliary aids and services necessary for effective communication to prospective deaf residents who use American Sign Language. Therefore, Defendants' conduct amounts to disability discrimination.

2.      American Sign Language ("ASL") is a visual, three-dimensional, and non-linear language, and its grammar and syntax differ from those of English and other spoken languages. With its own grammar and syntax, ASL is best thought of as a foreign language used by American deaf people. Deaf individuals are often educated in Deaf schools and grow up in culturally deaf environments. Because of both physical and environmental factors, deaf individuals usually have great difficulty achieving a working command of spoken or written English, while they can communicate complex thoughts and opinions with great ease in ASL. Therefore, most deaf individuals in medical facilities, nursing homes, assisted livings, and/or rehabilitation centers require ASL interpreters when that care involves complicated information and lengthy communications.

3.      NFHA used fair housing testers ("Testers") to monitor Defendants' compliance with the federal anti-discrimination laws and regulations. Testers asked whether Defendants could accommodate Testers' fictitious deaf mother-in-law at Defendants' facilities. Testers specifically asked whether Defendants will provide interpreters to the deaf mother-in-law for medical consultations and other important events at Defendants' facilities. Defendants' representatives or administrators told Testers that they cannot provide interpreters for her and that she must pay for her own interpreters.

4.     A senior living facility deprives deaf individuals' right to effective communication and equal housing opportunity when it fails to provide them an ASL interpreter. Thus, Defendants discriminated against prospective deaf residents by failing and/or refusing to provide them qualified ASL interpreters or other auxiliary aids and services for effective communication.

5.     Plaintiff brings this lawsuit to compel Defendants to cease unlawful discriminatory practices. Defendants must implement policies and procedures that will ensure effective communication, full and equal enjoyment, and a meaningful opportunity to participate in and benefit from Defendants' residential and health care services. Plaintiff seeks declaratory, injunctive, and equitable relief; compensatory and punitive damages; and attorneys' fees and costs to redress Defendants' unlawful disability discrimination in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3602 *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*; Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116 *et seq.*; and any regulations implementing the foregoing statutes.

## THE PARTIES

6.     Plaintiff NFHA is a non-profit, civil rights organization with its principal office located at 1331 Pennsylvania Avenue, NW, Suite 650, Washington, DC 20004.

7.     NFHA is dedicated to ending housing discrimination and ensuring equal housing opportunities for all people through leadership, education and outreach, membership services, public policy initiatives, community development, advocacy, and enforcement.

8.     NFHA engages in efforts to resolve and remedy acts of discrimination. Its enforcement efforts are designed to halt violations of the law, provide full and complete compensation to victims of discrimination, and prevent future discriminatory conduct.

9.      As part of NFHA's ongoing monitoring of housing discrimination, it employs individual "Testers"—who pose as prospective renters, home buyers, residents, and the like—to investigate any housing discrimination from local governments, landlords, real estate agents, companies, and others.

10.      NFHA spent significant staff time and other resources to investigate and respond to Defendants' discriminatory practices, which diverted resources away from other NFHA activities.

11.      Defendants' discriminatory practices—refusing to provide deaf individuals necessary auxiliary aids and services—made nursing home and assisted living facilities inaccessible to deaf individuals and frustrated NFHA's mission to ensure equal access to housing opportunities for all in Utah.

12.      Defendant BEEHIVE HOMES INC. is a corporation that owns, oversees, and operates assisted living and retirement homes across the United States. Its corporate address is at 3973 N Eagle Rd Boise, ID 83713. Upon information and belief, Defendant owns, oversees, and operates BEEHIVE HOMES OF LEHI.

13.      Defendant BEEHIVE HOMES OF LEHI is a senior living facility located at 322 N 2375 W, Lehi, UT 84043. Upon information and belief, Defendant is a recipient of federal financial assistance and is subject to the requirements of the Fair Housing Act, Section 504 of the Rehabilitation Act of 1973, and Section 1557 of the ACA.

## JURISDICTION & VENUE

14.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiff's claims arising under federal law, as well as 42 U.S.C. §3613(a) with respect to claims arising under the Fair Housing Act.

4

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendants reside within the jurisdiction of this District, and/or a substantial part of the events that give rise to the claims occurred in this District, and/or the Defendants have sufficient contacts with this District to subject them to personal jurisdiction at the time this action is commenced.

## STATEMENT OF FACTS

16.     Some background on Deaf[1] culture is necessary to understand the balance of this case. American Sign Language, "the sixth most commonly used language in this country," is not a gestured form of English. "ASL is a mix of native signs and French sign language. Some words are finger-spelled, borrowed from English the same way that the words gourmet, roulette, and taco are borrowed from French and Spanish." And the native signs derive from "hand shape, palm direction, placement of the hand on the body or within the signing space, movement, and non-manuals (facial expressions)." D. Scheier, *Barriers to Health Care for People with Hearing Loss: A Review of Literature*, Journal of the New York State Nurses Association at 6, https://bit.ly/2QYg8T6 (internal citations omitted). In other words, "ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages." *U.S. E.E.O.C. v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1105 (9th Cir. 2010). "In many cases, there is no one-to-one correspondence between signs in ASL and words in the English language." *Id.*

17.     Due to physical, environmental, and pedagogical factors, many deaf individuals

---

[1] "[T]he word deaf is written with either an uppercase or lower-case 'D.' When referring to the audiological condition of deafened people, deaf is written with a lower-case 'd.' An uppercase 'D' is used when writing about the Deaf culture, a group with which many prelingually deaf people affiliate themselves." D. Scheier, Barriers to Health Care for People with Hearing Loss: A Review of Literature, Journal of the New York State Nurses Association at 4, https://bit.ly/2QYg8T6.

have difficulty acquiring English. Indeed, the majority of prelingually deaf individuals are not fluent in English, and the median reading level of deaf high school graduates is fourth grade. *See* Jamie McAlister, *Deaf and Hard-of-Hearing Criminal Defendants: How You Gonna Get Justice If You Can't Talk to the Judge?,* 26 Ariz. St. L.J. 163, 180 n. 113 (1994). This is because many deaf people acquire English as their second language later in life—after ASL or another form of sign language—and well past the critical developmental period of language acquisition. *See People v. Ripic*, 587 N.Y.S.2d 776, 783 (N.Y. App. Div. 1992) ("Written English is often incomprehensible to deaf individuals whose primary language is American Sign Language.").

18.     Nor can deaf individuals communicate effectively by reading a person's lips. Lip-reading or speech-reading—the ability to understand the speech of another by watching the speaker's lips—does not provide effective communication for deaf and hard of hearing individuals. *See* Michele LaVigne & McCay Vernon, *An Interpreter Isn't Enough: Deafness, Language, and Due Process*, 2003 WISC. L.REV. 843, 855 (2003) In fact, the upper limits of estimates for lip-reading accuracy have been as low as 10% to 30% of words correct. *See* Lynne E. Bernstein & Edward T. Auer, *Speech Perception and Spoken Word Recognition*, *in* Oxford Handbook Of Deaf Studies, Language, And Education 399, 402 (Mark Marschark & Patricia E. Spencer eds., 2d ed. 2011) (citation omitted). This is because only a small amount of the spoken sounds of aural language are visible, and many of those appear identical on the lips. Even if a primary ASL user were able to determine the sounds appearing on a speaker's lips, he or she would still not necessarily understand the English language or the speaker's vocabulary, for the reasons set forth above. *See* LaVigne & Vernon, *supra*, at 857 ("Simply put, many deaf people do not understand the words we are using, even if the words are put into a visible form by writing or finger-spelling.").

19.     Thus, "[t]o deny a deaf person an ASL interpreter, when ASL is their primary language, is akin to denying a Spanish interpreter to a person who speaks Spanish as their primary language. *Updike v. Multnomah Cty.*, 870 F.3d 939, 958 (9th Cir. 2017).

20.     Effective communication is especially important in health care settings because "it is primarily through language that the physician works to establish rapport and trust. Good physician-patient communication is fundamental to good health care." E. McEwen & H. Anton-Culver, Journal of Family Practice, Vol. 26, No. 3:289–291, 291 (1988), https://bit.ly/2Fn3zLW.

21.     Unfortunately, "many physicians are reportedly unaware of Deaf culture and the health needs of deaf people. This may lead to assumptions and misconceptions about deafness that undermine professional health care. For example, practitioners often believe that lip reading/speech reading and note writing provide effective health communication. In reality, these are ineffective communication modalities for health care conversations. Deaf people who have practiced lip-reading/speech-reading for many years and who are familiar with spoken language are able to understand at best 30-45% of spoken English. Furthermore, note-writing is often constrained by deficits in health literacy and limited 'fund of information' deficits." A. Kuenburg, P. Fellinger, & J. Fellinger, Health Care Access Among Deaf People, Journal of Deaf Studies and Deaf Education, 2016, Vol. 21, No. 1:1–10, 2 (internal citations omitted), https://bit.ly/39GAPeZ.

Facts surrounding the NFHA Testing

22.     NFHA began its initial investigations of several nursing home facilities in Utah, on March 14, 2019, including those of Defendants. The investigation used Testers to make telephone calls and on-site visits to Defendants' facilities. Operating under aliases, Testers posed as family members of elderly deaf individuals seeking a residence at Defendants' nursing home/assisted living facilities. NFHA instructed Testers to tell Defendants' representatives that

Testers' deaf mother-in law primarily uses ASL and that she cannot read, write, or lip-read. NFHA also instructed Testers to ask Defendants whether Defendants' facilities will provide an ASL interpreter for the mother-in-law for on-site medical assessments and other important events. Testers also explained Defendants that the mother-in-law will not need interpreting services on a daily basis, but only for important events.

23.    Plaintiff has electronically stored information of the contacts between Testers and Defendants' representatives.

### Factual Allegations Against Defendants

24.    On March 21, 2019, Tester L.A. along with Tester M.H. ("Testers") visited Defendants' facility, BeeHive Homes of Lehi. Testers represented that they are searching for a resident living facility for their fictitious deaf mother-in-law. During their visit, Testers spoke with the facility's chief operations officer, Rachel. Testers informed Rachel that their mother-in-law has been deaf since birth and relies solely on ASL for communication. Testers asked whether an ASL interpreter would be provided for important medical services. Rachel responded that the facility would try to determine whether Medicare would cover the cost of interpreters or try to find a home health company that would provide free ASL services. If neither works, however, Rachel informed Testers that the resident will be responsible for the cost.

### Diversion of Resources and Frustration of Mission

25.    Defendants' discriminatory practices have frustrated and continue to frustrate NFHA's mission of eliminating housing discrimination and ensuring equal housing opportunities for all in Utah and throughout the country. Specifically, Defendants' discriminatory policies and practices alleged in this Complaint frustrate NFHA's mission because they violate federal anti-discrimination laws, undermine rather than advance equal housing opportunities, perpetuate the harms of disability discrimination, and prevent people with disabilities from fully and equally

8

enjoying, participating in, and benefitting from Defendants' residential and health care services.

26.   Over the past several years, and prior to the filing of this Complaint, NFHA has diverted its scarce resources and staff from other activities to investigate and counteract Defendants' disability discrimination. In doing so, NFHA had to go beyond its normal operations. For example, NFHA directly outreached to Utah residents and facilities (including through mailings and educational flyers) regarding the housing rights of deaf and hard of hearing individuals in assisted living facilities. This targeted, localized, and direct outreach required specific expenditures that were distinct from NFHA's everyday operations, which are usually national in scope and designed to have a broader focus.

27.   NFHA diverted considerable resources and staff time to conduct the testing, which included, preparing and planning multiple trainings for its staff and testers; conducting numerous internal and external meetings; researching and planning the testing; identifying the nature and scope of the testing; drafting and designing testing materials; documenting the testing progress and results; travel time and expenses; and significant staff hours diverted from other work to conduct these testing activities.

28.   In addition, NFHA has engaged in various community outreach and public education campaigns to counteract and to raise awareness of the discriminatory practices among senior living facilities. For example:

> a.   In March 2020, NFHA ran a series of four social media posts to educate the public about fair housing laws regarding senior housing providers, including assisted living facilities and nursing homes. This content, shared on NFHA's Facebook (two posts), Twitter (one post), and Instagram page (one post), included a mixture of text, graphics, and video clips. Each post provided a link

to NFHA's dedicated web page that has numerous resources related to discrimination against deaf and hard of hearing individuals in senior living facilities. These posts generated thousands of impressions (views) across social media platforms.

b. In December 2019, NFHA staff members mailed an educational letter and flyers to assisted living facilities, senior placement services, government agencies, hospitals and libraries, schools, non-profits, senior centers, and interpretation and relay service organizations in the metro areas of Salt Lake City, Utah. The mailing was sent to 41 assisted living facilities, 3 senior placement services, 6 government agencies, 2 hospitals, 1 library, 3 schools, 2 non-profit organizations, 12 senior centers, 1 sign language interpretation service, and 1 relay service organization. NFHA solicited an advertising agency's assistance in creating a public service announcement ("PSA") that was designed to educate the public about fair housing laws for individuals who are deaf or hard of hearing, especially those living in an assisted living facility. At least one printed PSA was sent with each mailing. Each mailing also included one printed copy of NFHA's Brochure titled "Fair Housing Rights of Persons Who Are Deaf or Hard of Hearing or Who Are Blind or Have Low Vision" and one printed copy of NFHA's Flyer titled "The Fair Housing Act Prohibits Discrimination Against Those Who Are Deaf or Hard of Hearing."

c. In September 2019, NFHA added educational information to its website, along with links to local fair housing centers, the Department of Housing and

Urban Development, and the National Association of the Deaf, specifically designed to educating the general public about fair housing laws regarding senior housing providers, including assisted living facilities and nursing homes. The educational information includes three fair housing videos presented in American Sign Language with English subtitles. The content remains on NFHA's website to date. *See* National Fair Housing Alliance, *Discrimination Against Deaf and Hard of Hearing Individuals in Senior Living Facilities*, https://nationalfairhousing.org/discrimination-against-deaf-and-hard-of-hearing-individuals-in-senior-living-facilities/ (last accessed April 2, 2020)

29.     Each of these activities required the diversion and expenditure of financial resources and staff time, which included, researching and planning the activities; conducting numerous internal and external meetings; drafting and designing educational materials; producing videos and graphic design; mailing and traveling; and significant staff hours diverted from other work to conduct these outreach activities.

**COUNT I: VIOLATIONS OF THE FAIR HOUSING ACT AGAINST**

30.     Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

31.     This action is brought to enforce of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, et seq.

32.     Defendants own and/or lease dwellings within the meaning of U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

33.     The FHA provides that it is illegal "to discriminate against any person in the terms, conditions, privileges of sale or rental of a dwelling or in the provision of services or

facilities in connection with such dwelling," because of disability. 42 U.S.C. § 3604(f)(2).

34.    Under the FHA, discrimination includes "a refusal to make reasonable accommodations in rules, polices, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

35.    Under the FHA, it is unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . handicap . . . or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c).

36.    Plaintiff's Testers, on behalf of their fictitious deaf family member, requested and were denied the reasonable accommodation of having a qualified ASL interpreter, and thus, were denied access and an opportunity to participate, use and enjoy services provided by Defendants' facilities that are connected to their dwellings and which equally situated hearing residents are able to enjoy.

37.    Defendants discriminated on the basis of disability, in violation of the above-cited provisions of the FHA.

38.    Defendants violated the FHA by, inter alia, denying Plaintiff's Testers' requests for the provision of a qualified sign-language interpreter and thereby denying their fictitious deaf family members, on whose behalf the Testers were inquiring, access to services, programs or activities provided by Defendants in connection to their facilities. Defendants violated the FHA by, inter alia, adopting, stating, and advertising their policy or practice of refusing to provide qualified sign-language interpreters to any person requesting such accommodations in order to reside at Defendants' facilities.

39.     Upon information and belief, Defendants' refusal to offer ASL interpreter services is the result of a policy or practice of Defendants, and Defendants are deliberately indifferent to the rights of a deaf individual to have an equal opportunity to benefit from Defendants' services.

40.     Regardless of whether the statements made by Defendants were intended to indicate any preference, limitation, or discrimination based on disability, an ordinary listener would understand their statements to indicate a limitation, preference, or discrimination because of the disability of the proposed occupants. These statements were made in the course of advertising and marketing the Defendants' dwelling units to potential applicants. They had the effect of infringing on the rights of people with disabilities.

41.     Plaintiff is an aggrieved person within the meaning of 42 U.S.C. § 3602(i), has been injured as a result of Defendants' discriminatory conduct, and has suffered damages, including diversion of resources and frustration of mission.

42.     Accordingly, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to the FHA, 42 U.S.C. § 3613(c).

## COUNT II: VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT

43.     Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

44.     At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 has been in full force and effect and has applied to the Defendants' conduct.

45.     At all times relevant to this action, the United States Department of Health and Human Services ("HHS") regulations implementing Section 504 of the Rehabilitation Act, 45 C.F.R. Part 84, have been in full force and effect and have applied to the Defendants' conduct.

46.     At all times relevant to this action, each of the Defendants received federal

financial assistance, including Medicare and/or Medicaid grants and/or reimbursements, housing grants, state and federal program grants, and have been principally engaged in the business of providing health care. Therefore, Defendants' facilities and services are "a program or activity" receiving federal financial assistance pursuant to 29 U.S.C. § 794(b).

47.     Pursuant to Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

48.     Defendants' actions constitute discrimination, solely on the basis of disability, by denying meaningful access to the services, programs, and benefits that Defendants offer to other individuals, and by refusing to provide auxiliary aids and services necessary to ensure effective communication, in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

49.     Pursuant to Federal regulations implementing Section 504 of the Rehabilitation Act, programs or activities receiving Federal financial assistance "must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." 45 C.F.R. § 84.4(b)(2).

50.     Pursuant to Federal regulations implementing Section 504 of the Rehabilitation Act, healthcare providers "shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question. . . . For the purpose of this paragraph, auxiliary aids may include brailled and taped material, interpreters, and other aids for persons with impaired hearing or vision." 45 C.F.R. § 84.52(d).

14

51.     Upon information and belief, Defendants' refusal to offer ASL interpreter services is the result of a policy or practice of Defendants, and Defendants are deliberately indifferent to the rights of a deaf individual to have an equal opportunity to benefit from Defendants' services.

52.     The Rehabilitation Act extends standing and relief to "any person aggrieved" by discrimination in violation thereof. 29 U.S.C. § 794a(a)(2).  Plaintiff is an aggrieved person as defined by Section 794a(a)(2) of the Rehabilitation Act. As a result of Defendants' actions alleged above, Plaintiff has been injured as a result of Defendants' discriminatory conduct, and has suffered damages, including diversion of resources and frustration of mission.

53.     Plaintiff is therefore entitled to seek and recover compensatory damages for the injuries and loss sustained as a result of Defendants' discriminatory conduct and deliberate indifference, including the diversion of its resources and frustration of its mission, as hereinbefore alleged, pursuant to 29 U.S.C. § 794(a).

54.     As set out above, absent injunctive relief there is a clear risk that Defendants' actions will continue to occur and continue to frustrate Plaintiff's mission. Therefore, Plaintiff is entitled to injunctive relief.

55.     Plaintiff is further entitled to an award of attorney's fees, costs, and disbursements pursuant to the Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) and/or common law.

## COUNT III: VIOLATIONS OF SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT

56.     Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

57.     At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act ("ACA") and its implementing regulations 45 C.F.R. Part 92 et seq. have been in full force and effect and applied to the Defendants' conduct. 42 U.S.C. § 18116; 45

C.F.R. Part 92 *et seq*.

58.     The ACA, by incorporating the enforcement mechanism of the Rehabilitation Act, extends a cause of action to "any person aggrieved" by discrimination in violation thereof. 42 U.S.C. § 18116(a).

59.     At all times relevant to this action, Defendants received federal financial assistance, including Medicare and/or Medicaid grants and/or reimbursements, housing grants, state and federal program grants, and have been principally engaged in the business of providing health care. Because each of the Defendants are engaged in a health program or activity receiving federal financial assistance, they are subject to the ACA pursuant to 42 U.S.C. § 18116(a).

60.     Pursuant to Section 1557 of the ACA "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. §18116.

61.     Pursuant to 45 C.F.R. §92.202, "[a] covered entity shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in health programs and activities, in accordance with the standards found at 28 CFR 35.160 through 35.164. Where the regulatory provisions referenced in this section use the term "public entity," the term "covered entity" shall apply in its place." 45 C.F.R. §92.202.[2]

---

[2] 28 CFR 35.160 "(b)(1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity. (2) The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with

62.     Pursuant to 45 C.F.R. §92.205, "[a] covered entity shall make reasonable modifications to policies, practices, or procedures when such modifications are necessary to avoid discrimination on the basis of disability . . . the term reasonable modifications shall be interpreted . . . as set forth in the ADA Title II regulation." 45 C.F.R. §92.205.

63.     Pursuant to 45 C.F.R. §92.209, "[a] covered entity shall not exclude from participation in, deny the benefits of, or otherwise discriminate against an individual or entity in its health programs or activities on the basis of the race, color, national origin, sex, age, or disability of an individual with whom the individual or entity is known or believed to have a relationship or association." 45 C.F.R. §92.209.

64.     As set forth above, each of the Defendants discriminated against deaf individuals, on the basis of disability, in violation of the ACA and its implementing regulations. Plaintiff has been injured as a result of Defendants' discriminatory conduct, and has suffered damages, including diversion of resources and frustration of mission.

65.     Plaintiff is therefore entitled to injunctive relief, as well as compensatory damages for the injuries and loss she sustained as a result of Defendants' discriminatory conduct and deliberate indifference as hereinbefore alleged, pursuant to 42 U.S.C. § 18116(a).

66.     Plaintiff is further entitled to an award of attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 18116(a) and/or common law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays that this Court grant the following relief:

---

disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. (c)(1) A public entity shall not require an individual with a disability to bring another individual to interpret for him or her. (2) A public entity shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication." 28 CFR 35.160 (emphasis added).

a.   Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' policies, procedures, and practices have discriminated in violation of The Fair Housing Act ("FHA"), 42 U.S.C. § 3602; Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794; and Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116.

b.   Enjoin Defendants from implementing or enforcing any policy, procedure, or practice that denies deaf or hard of hearing individuals meaningful access to and full and equal enjoyment of Defendants' facilities, services or programs;

c.   Order Defendants:

   i.   to develop, implement, promulgate, and comply with a policy prohibiting future discrimination of failing to provide effective communication against deaf or hard of hearing individuals;

   ii.   to develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests an onsite interpreter for effective communication, one will be provided as soon as practicable in all services offered by Defendants;

   iii.   to develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly worded notices that Defendants will provide sign language interpreters, videophones, and other communication services to ensure effective communication with deaf or hard of hearing persons;

   iv.   to develop, implement, promulgate, and comply with a policy to ensure that

18

deaf or hard of hearing individuals are able to communicate through the most appropriate method under the circumstances;

  v. to create and maintain a list of American Sign Language interpreters and ensure availability of such interpreters at any time of day or night;

  vi. to train all their employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the FHA, RA, and ACA.

  vii. to train all their employees, staff, and other agents on a regular basis about Defendants' policy regarding how to obtain interpreters when reasonably requested by deaf or hard of hearing individuals; and

  viii. to implement a program of testing Defendants' employees, staff, and other agents to determine whether they are complying with the requirements of the FHA, RA, and ACA.

d. Award to Plaintiff:

  i. Compensatory damages pursuant to the RA, FHA, and ACA;

  ii. Punitive damages pursuant to the FHA;

  iii. Reasonable costs and attorneys' fees pursuant to the RA, FHA, and ACA;

  iv. Interest on all amounts at the highest rates and from the earliest dates allowed by law;

  v. Any and all other relief that this Court finds necessary and appropriate.

Dated: May 13, 2020

Respectfully submitted,

By:

Andrew Rozynski, Esq.*
Eric m. Baum, Esq. *
EISENBERG & BAUM, LLP
24 Union Square East, Fourth Floor
New York, NY 10003
Main: (212) 353-8700
Fax: (212) 353-1708
Email: arozynski@eandblaw.com
       ebaum@eandblaw.com

Morgan Williams*
NATIONAL FAIR HOUSING ALLIANCE
1331 Pennsylvania Avenue, NW, Suite 650
Washington, DC 20004
Main: (202) 898-1661
Email: mwilliams@nationalfairhousing.org

Jared Allebest, #13485 (UT)
ALLEBEST LAW GROUP PLLC
8978 South Quarry Stone Way
Sandy, Utah 84094

*Attorneys for Plaintiff*

*pro hac vice* application to be filed